## No. 24-3544

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

**United States of America,**

**Plaintiff-Appellee,**

**v.**

**Oscar Vazquez-Ramirez,**

**Defendant-Appellant.**

———————————

On Appeal from the United States District Court
For the Eastern District of Washington
District Court No. 2:22-cr-87-RMP-1
Honorable Rosanna M. Peterson, United States District Judge

———————————————————————

**Defendant-Appellant's
Opening Brief**

———————————————————————

Carter Powers Beggs
Federal Defenders of Eastern
Washington & Idaho
601 West Riverside Ave., Suite 900
Spokane, Washington 99201
(509) 624-7606
Email: carter_powersbeggs@fd.org
Attorney for Defendant-Appellant

TABLE OF CONTENTS

I.    Summary of Argument.................................................................. 7

II.   Jurisdictional Statement ............................................................ 7

III.  Statement of Issues.................................................................... 8

IV.   Detention Status........................................................................ 8

V.    Statement of the Case and Factual Summary ................................. 8

      A.    Mr. Vazquez-Ramirez's life as a long-term American resident............. 8

      B.    Mr. Vazquez-Ramirez obtains a firearm for lawful self-defense.......... 10

      C.    Mr. Vazquez-Ramirez's firearm is identified by law enforcement. ..... 10

      D.    Mr. Vazquez-Ramirez moves to dismiss with the aid of the nation's
            preeminent expert at the intersection of firearms and immigration. ....11

            1.    Professor Gulasekaram pored through historical firearm
                  regulations related and unrelated to immigration status. ...........12

            2.    There was no historical tradition of laws disarming individuals
                  based on immigration status at the founding. .........................13

            3.    At the Founding "aliens" being deported was imaginable. .......14

            4.    Potential historical analogues to §922(g)(5) require either
                  reliance on improper animus or too high a level of generality. ...15

      E.    The district court denies Mr. Vazquez-Ramirez's motion to dismiss
            and sentences him to five years of probation. ......................................16

VI.   Standard of Review.................................................................... 17

VII.  Argument................................................................................. 18

      A.    Second Amendment claims center around three main issues. .............18

      B.    Mr. Vazquez-Ramirez is entitled to Second Amendment protections.20

            1.    The Fourth, Fifth, and Eighth Circuit's approach veers away
                  from Supreme Court precedent and relies upon dicta. ..............21

            2.    The Seventh Circuit takes the approach rooted in precedent... 22

            3.    Mr. Vazquez-Ramirez fulfills the substantial connection test... 25

      C.    Mr. Vazquez-Ramirez's conduct falls under the plain text of the
            Second Amendment. .......................................................................... 26

      D.    The Government cannot establish that §922(g)(5) comports with the

Founders' historical understanding of firearm regulation..................28

1. Some states during the Revolutionary War instituted temporary loyalty-based disarmaments. ....................................................29

    a. The "how" of loyalty oaths differ from §922(g)(5)........30

    b. The "why" of loyalty oaths differ from §922(g)(5)........32

2. The Government must establish that §922(g)(5) actually addresses the "principle" it purports to address......................35

E. The district court erred in adopting rational basis review....................37

F. Mr. Vazquez-Ramirez notes a miscite underlies 9th Circuit precedent. ............................................................................40

VIII. Conclusion ...........................................................................41

Service Certificate............................................................41

# Table of Authorities

**Page(s)**

**Cases**

*Al Bajah v. Holder,*
  311 F. App'x 995 (9th Cir. 2009) ................................................................31, 33, 34
*Bridges v. Wixon,*
  326 U.S. 135 (1945) ................................................................................. 39
*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ........................................................................... 19, 23
*Doe v. Bonta,*
  101 F.4th 633 (9th Cir. 2024) ........................................................... 27
*Drummond v. Robinson,*
  9 F. 4th 217 (3rd Cir. 2021) ............................................................... 34
*Ibrahim v. Dep't of Homeland Sec.,*
  669 F.3d 983 (9th Cir. 2012) .............................................................. 25
*Kwong Hai Chew v. Colding,*
  344 U.S. 590 (1953) ................................................................................. 39
*Mathews v. Diaz,*
  426 U.S. 67 (1976) ........................................................................... 35, 38
*New York Rifle and Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022) .......................................................................... Passim
*Perez-Garcia,*
  96 F.4th 1166 (9th Cir. 2024) ........................................................... 25
*Range v. A.G.,*
  69 F.4th 96 (3d Cir. 2023) ................................................................. 24
*U.S. v. Barona,*
  56 F.3d 1087 (9th Cir. 1995) ............................................................. 40
*U.S. v. Carpio-Leon,*
  701 F.3d 974 (4th Cir. 2012) ............................................................. 22
*U.S. v. Flores,*
  663 F.3d 1022 (8th Cir. 2011) ........................................................... 22
*U.S. v. Huitron-Guizar,*
  678 F.3d 1164 (10th Cir. 2012)..................................................... 21, 27
*U.S. v. Jimenez-Shilon,*
  34 F.4th 1042 (11th Cir. 2022) ................................................. 13, 16, 21

*U.S. v. Manney*,
  2024 WL 3853846 (9th Cir. 2024) ...................................................... 27

*U.S. v. Meza-Rodriguez*,
  798 F.3d 664 (7th Cir. 2015) ............................................ 23, 24, 25, 26

*U.S. v. Oliver*,
  41 F.4th 1093 (9th Cir. 2022) ...................................................... 18

*U.S. v. Olsen*,
  21 F.4th 1036 (9th Cir. 2022) ...................................................... 18

*U.S. v. Perez*,
  6 F.4th 448 (2d Cir. 2021) ......................................................... 21

*U.S. v. Portillo-Munoz*,
  643 F.3d 437 (5th Cir. 2011) ................................................. 22, 23

*U.S. v. Rahimi*,
  , 144 S.Ct. 1898 (202 .........................................19, 20, 30, 37

*U.S. v. Sitladeen*,
  64 F.4th 978 (8th Cir. 2023) ...................................................... 28

*U.S. v. Torres*,
  911 F.3d 1253 (9th Cir. 2019) ................................... 17, 21, 34, 36

*U.S. v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) .........................................................23, 25, 40

*U.S. v. Verdugo-Urquidez*,
  856 F.2d 1214 (9th Cir. 1988) .................................................... 40

*U.S. v. Zakharov*,
  468 F.3d 1171 (9th Cir. 2006) .................................................... 40

*United States v. Duarte*,
  101 F.4th 657 (9th Cir.) ...........................................................31

*United States v. Medina-Cantu*,
  113 F.4th 537 (5th Cir. 2024) .................................................... 22

*Wong Wing v. U.S.*,
  163 U.S. 228 (1896) ................................................................. 38

*Worth v. Jacobson*,
  108 F.4th 677 (8th Cir. 2024) .................................................... 36

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ................................................................. 38

**Statutes**

18 U.S.C. §922(g)(5) ...................................................... Passim

18 U.S.C. §922(g)(5)(A) ............................................................... 12

18 U.S.C. §922(g)(6) ...................................................................16

18 U.S.C. §922(g)(7).....................................................................16

18 U.S.C. § 3231 ........................................................................... 8

18 U.S.C. §§ 922(d)(10), (i), (l) ................................................. 34

18 U.S.C. §§ 2332, 2339A, 2339B & 2339D (EP) ..................... 34

28 U.S.C. § 1291 ............................................................................ 9

U.S. Const. amend. II ..............................................................19, 20

**Other Authorities**

*Aliens with Guns: Federal Power, Noncitizens, and the Second Amendment*,

  92 Iowa L. Rev. 891 (2007)......................................................13

Pratheepan Gulasakeram, *Immigration Exceptionalism*,

  77 Vand. L. Rev. En Banc 1 (2024) ......................................... 39

*The People of the Second Amendment: Citizenship and the Right to Bear Arms*,

  85 N.Y.U. L. Rev. 1521 (2010) ......................................... 13, 16

*The Second Amendment's "People" Problem*,

  76 Vanderbilt Law Review 1437 (2023) ..................................13

*Why Can't Martha Stewart Have a Gun?*,

  32 Harv. J.L. & Pub. Pol′y 695 (2009) ................................... 29

## I.   SUMMARY OF ARGUMENT

At our founding, a nation of immigrants bound itself together with a shared understanding of individual rights. This understanding, enshrined within the Bill of Rights, recognizes the right of the People to possess arms for self-defense. Over two centuries later, Oscar Vazquez-Ramirez—an immigrant with substantial connections to the United States—possesses this same right. This right was violated when he was convicted of unlawfully possessing a handgun for self-defense.

While Mr. Vazquez-Ramirez's right to bear arms for self-defense is not unlimited, those limits must comport with the Founders' understanding of the firearm right. At the founding, our nation of immigrants did not criminalize firearm possession by undocumented immigrants, nor any similar conduct. As a result, the categorical, no-exceptions disarmament of Mr. Vazquez-Ramirez—a non-violent, long-term resident of our country—violates the Second Amendment.

## II.   JURISDICTIONAL STATEMENT

The district court held original jurisdiction due to Mr. Vazquez being charged with a federal criminal offense.[1] The district court rendered a final judgment on

---

[1] 18 U.S.C. § 3231 (granting original jurisdiction to district courts over "all offenses against the laws of the United States").

June 4, 2024.[2] Mr. Vazquez-Ramirez filed a timely notice of appeal on June 5, 2024.[3] This Court holds jurisdiction under 28 U.S.C. § 1291.

## III. Statement of Issues

There is one issue:

(1) Is 18 U.S.C. §922(g)(5) unconstitutional as applied to Mr. Vazquez-Ramirez—a nonviolent, long-term, undocumented resident of the U.S.

## IV. Detention Status

Mr. Vazquez-Ramirez was sentenced to five years of probation on June 4, 2024,[4] and immediately taken into immigration custody outside the courtroom.

## V. Statement of the Case and Factual Summary

A. **Mr. Vazquez-Ramirez's life as a long-term American resident.**

Mr. Vazquez-Ramirez's upbringing speaks to our nation's immigrant origins. Born in Mexico, Mr. Vazquez-Ramirez was brought to the United States at seven years old for better economic opportunities and a better life.[5] Residing in Washington State's agriculturally focused central valley, he soon began assimilating into the American way of life—attending school and learning English.[6]

---

[2] 1–ER–2 (Judgment).
[3] 3-ER-395 (Notice of Appeal).
[4] *See* 1-ER-2 (Judgment).
[5] *See* 2-ER-227 (First Declaration of Oscar Vazquez-Ramirez).
[6] *See id.*

– 8 –

Mr. Vazquez-Ramirez completed school through the 10th grade, dropping out in 11th grade to work in the fields.[7] Like most participants in our nation's school system Mr. Vazquez-Ramirez learned to write English on lined paper, learned the story of our nation's history, and every single morning he pledged allegiance to our nation's flag.[8] When he stood and sang the national anthem at school assemblies or sporting events, it came from his heart because he loves this country and considers it his home.[9]

After dropping out of high school in the 11th grade to work full-time, Mr. Vazquez started off in the Othello fields.[10] Eventually his skill with motors was noticed and he transitioned to working as a diesel mechanic.[11] Along the way, Mr. Vazquez got married, started a family, and had two U.S. citizen children.[12] His children attend school in Washington just like Mr. Vazquez-Ramirez did as a child[13] They also attended weekly church services as a family at Sacred Heart Catholic Church in Othello.[14]

---

[7] *Id.*
[8] *See* 2-ER-87 (Second Declaration of Oscar Vazquez-Ramirez).
[9] *Id.*
[10] *See* 2-ER-227 (First Declaration of Oscar Vazquez-Ramirez).
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*

B. **Mr. Vazquez-Ramirez obtains a firearm for lawful self-defense.**

In 2011, Mr. Vazquez-Ramirez moved his family (including his mother) to a small neighborhood in Othello which locals referred to as "Little Mexico".[15] While fine at first, the neighborhood began to see a rise in crime. Mr. Vazquez-Ramirez became particularly concerned when two women were found killed and dismembered at a house in early-2021—only a few blocks from his home.[16]

In response, Mr. Vazquez-Ramirez purchased a pistol from a friend for the protection of him and his family.[17] Mr. Vazquez-Ramirez never used the gun, instead keeping it with him while traveling in the Othello area.[18]

C. **Mr. Vazquez-Ramirez's firearm is identified by law enforcement.**

On December 15, 2021, Mr. Vazquez-Ramirez was pulled over for a traffic violation in Othello, Washington. Officers at the scene asked him if he has a gun on his person, Mr. Vazquez-Ramirez told them he had a gun in his waistband. Following this admission, Mr. Vazquez was arrested on suspicion of possessing a firearm unlawfully and driving under the influence of alcohol as he blew a .093—

---

[15] 2-ER-227 (First Declaration of Oscar Vazquez-Ramirez).
[16] *See id.*; *see also Othello Man Arrested for Killing Two Women; Dismembering and Disposing of Bodies*, KEPR, Jan. 29, 2021, https://keprtv.com/news/local/othello-man-arrested-for-killing-two-people-dismembering-and-disposing-of-bodies (last accessed Sept. 26, 2024).
[17] 2-ER-227 (First Declaration of Oscar Vazquez-Ramirez).
[18] *Id.*

barely over the .08 legal limit.[19] Mr. Vazquez-Ramirez's firearm was surrendered to law enforcement without incident.[20] Eight months later, Mr. Vazquez-Ramirez was charged in a single-count federal indictment with 18 U.S.C. §922(g)(5)(A): Alien in Possession of a Firearm and Ammunition.[21]

### D. **Mr. Vazquez-Ramirez moves to dismiss with the aid of the nation's preeminent expert at the intersection of firearms and immigration.**

Following his initial federal arrest, Mr. Vazquez-Ramirez was released from custody on pretrial release where he remained without incident until the resolution of his case.[22] A year later, Mr. Vazquez-Ramirez moved to dismiss the indictment as unconstitutional as applied to him.[23] In support of his motion, Mr. Vazquez-Ramirez employed the preeminent expert on the intersection of firearms and immigration—Professor Pratheepan Gulasekaram.[24]

Professor Gulasekaram is a Provost Professor of Law at Colorado Law School where he teaches both immigration and constitutional law.[25] He co-authors the most widely used immigration law textbook used in law schools.[26] Academically, his research focuses on the nexus between the constitution and immigration law.[27]

---

[19] 2-ER-114 (Othello PD Report).
[20] 2-ER-113 (Othello PD Report).
[21] 3-ER-393 (Indictment).
[22] *See generally* 3-ER-397–405 (Docket Sheet).
[23] 2-ER-116 (Motion to Dismiss).
[24] 2-ER-120 (Motion to Dismiss).
[25] 2-ER-155 (Declaration of Gulasekaram).
[26] *Id.*
[27] 2-ER-156 (Declaration of Gulasekaram).

Most pertinently, he has published extensively on the specific topic of the Second Amendment and noncitizens.[28] This work has not gone without recognition, having been cited by numerous district courts discussing §922(g)(5) as well as at the circuit level.[29]

In assistance to Mr. Vazquez-Ramirez, Professor Gulasekaram provided both a 65-page declaration, as well as around two hours of in-court-testimony.[30] While his lengthy declaration and testimony are rich with information on this issue, his work has several key takeaways:

1. **Professor Gulasekaram pored through historical firearm regulations related and unrelated to immigration status.**

In preparing his declaration and testimony, Professor Gulasekaram conducted extensive research in conjunction with his existing scholarly expertise. He reviewed legal repositories and online databases including the Duke Law School's Center for Firearms Law, historical gun law repository.[31] He also looked at colonial law digests, state law digests, and congressional records. Onerous amounts of books, law journal

---

[28] *See generally, The Second Amendment's "People" Problem*, 76 VANDERBILT LAW REVIEW 1437 (2023); *Guns and Membership in the American Polity*, 21 WILLIAM & MARY B. RTS. J. 619 (2012); *The People of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. REV. 1521 (2010); *Aliens with Guns: Federal Power, Noncitizens, and the Second Amendment*, 92 IOWA L. REV. 891 (2007).

[29] 2-ER-156 (Declaration of Gulasekaram); *see for example U.S. v. Jimenez-Shilon*, 34 F.4th 1042, 1048 (11th Cir. 2022) (citing Professor Gulasekaram).

[30] 2-ER-155–219 (Declaration of Gulasekaram); *see generally* 3-ER-252–371 (Transcript of Evidentiary Hearing).

[31] 2-ER-158 (Declaration of Gulasekaram).

articles, and academic journal articles were consulted.[32]  Finally, (and perhaps most importantly) Professor Gulasekaram brought his nearly 20 years of experience working at the intersection of immigration and firearms regulation: researching publications, attending conferences, consulting with other historical experts on the topic, and in turn being consulted by them.[33]

Professor Gulasekaram does not, and cannot, claim to have conducted a wholly exhaustive search of colonial firearms regulation[34]—such a claim is unneeded and not the defense's burden. What Professor Gulasekaram can provide is the most accurate historical survey and amalgamation of scholarship on this topic that he can provide, which yielded important historical takeaways.

### 2. There was no historical tradition of laws disarming individuals based on immigration status at the founding.

Professor Gulasekaram's historical review determined there was "no historical twins to §922(g)(5)." No federal law existed at the founding that regulated firearms on the basis of immigration status.[35] At the federal level, regulation based on immigration status did not arise "until 1940, when Congress enacted the first firearms-related deportation law."[36] True federal criminal

---

[32] *See* 2-ER-158–161 (Declaration of Gulasekaram).
[33] *See* 2-ER-161–162 (Declaration of Gulasekaram).
[34] *See* 2-ER-163–164 (Declaration of Gulasekaram).
[35] 3-ER-274 (Evidentiary Hearing Transcript 23:8–19).
[36] 2-ER-165 (Declaration of Gulasekaram) (emphasis removed).

prohibitions on noncitizen possession only emerged when the statute later recodified as §922(g)(5) was passed in 1968 as part of the omnibus crime and firearm regulations of that year.[37]

In turn, no state level regulation addressed statusless individuals' firearm rights at the founding.[38] At the state level, it was only until the 1900s—well after the founding era—that some states enacted firearms laws that specifically excluded noncitizens from possessing firearms.[39] Professor Gulasekaram correctly notes that at that time the Second Amendment did not specifically constrain state-level gun regulation.[40] Additionally, some of these restrictions were short lived, being struck down as violations of state constitutions or federal equal protections.[41]

### 3. At the Founding "aliens" being deported was imaginable.

Professor Gulasekaram also notes that while distinct in some ways from modern immigration legislation, deportation authority was not a foreign concept at the founding.[42] The Alien Friends Act and the Alien Enemies Act were passed for a brief period from 1798 to 1801, and delegated deportation authority to the President for individuals deemed "dangerous to the peace and safety of the United States."[43]

---

[37] 2-ER-166 (Declaration of Gulasekaram).
[38] 3-ER-274–275 (Evidentiary Hearing Transcript 23:20–24:2).
[39] 2-ER-166 (Declaration of Gulasekaram).
[40] 2-ER-166; *see also* 3-ER-279 (Evidentiary Hearing Transcript 28:2–22).
[41] 2-ER-166–167 (Declaration of Gulasekaram).
[42] *See* 3-ER-273 (Evidentiary Hearing Transcript 22:20–24).
[43] 3-ER-272 (Evidentiary Hearing Transcript 21:2–13).

As such, the removal and regulation of "aliens" was not a foreign possibility at the founding.

### 4. Potential historical analogues to §922(g)(5) require either reliance on improper animus or too high a level of generality.

Professor Gulasekaram identified no historical predecessors to §922(g)(5), only ill-formed historical analogues. Historical firearm prohibitions based on race, religion, or other animus violate modern constitutional standards.[44] Other firearm prohibitions were tied to "the notions of loyalty, especially during the Revolutionary period."[45] However, if one wanted to analogize between loyalty oaths and current federal statutes "the best one could do would be to analogize to (g)(6) or (g)(7), but not to (g)(5)."[46] §922(g)(6) and (7) banning firearm possession by those who were dishonorably discharged from the military or who have renounced their United States citizenship respectively.[47]

Professor Gulasekaram additionally notes that while other courts such as the 11th Circuit in *Jimenez-Shilon* have quoted him for the claim that early firearms regulations revealed "disarmament of groups associated with foreign elements",[48]

---

[44] 2-ER-165 (Declaration of Gulasekaram).
[45] 2-ER-197 (Declaration of Gulasekaram).
[46] 3-ER-286 (Evidentiary Hearing Transcript 35:16–17
[47] 18 U.S.C. §922(g)(6); 18 U.S.C. §922(g)(7).
[48] 34 F.4th at 1048 (quoting Pratheepan Gulasekaram, "*The People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. Rev. 1521, 1548–49 (2010).

this quote was misconstrued in the §922(g)(5) context.[49] As Professor Gulasekaram previously noted, he does not view loyalty oaths during a time of war as addressing §922(g)(5),[50] these state laws were passed at a time the Second Amendment was not incorporated against the states,[51] and that categorical bans on firearm possession were premised on now defunct racial classifications.[52]

E.  **The district court denies Mr. Vazquez-Ramirez's motion to dismiss and sentences him to five years of probation.**

A few weeks following the evidentiary hearing, the district court issued an order denying Mr. Vazquez-Ramirez's motion to dismiss.[53] In doing so, the district court found in the first instance that rational basis review was the proper method to evaluate Mr. Vazquez-Ramirez's constitutional claim as it related to immigration,[54] and that the Government's interest in "controlling crime and ensuring public safety" served as sufficient basis to uphold the statue as constitutional.[55] Due to the "lack of clarity" surrounding the *Bruen* analysis, the district court forged on, finding that Mr. Vazquez-Ramirez conduct was not protected by the Second Amendment,

---

[49] *See* 3-ER-288 (Evidentiary Hearing Transcript 37:1–4).
[50] *See* 3-ER-288 (Evidentiary Hearing Transcript 37:4–8).
[51] *See* 3-ER-288 (Evidentiary Hearing Transcript 37:16–19).
[52] *See* 3-ER-288 (Evidentiary Hearing Transcript 37:22–38:16).
[53] 1-ER-8 (Order Denying Motion to Dismiss).
[54] 1-ER-11 (Order Denying Motion to Dismiss) (noting that the court was not aware of any other courts addressing §922(g)(5) through an immigration framework).
[55] 1-ER-15 (Order Denying Motion to Dismiss) (citing *U.S. v. Torres* 911 F.3d 1253, 1263–64 (9th Cir. 2019).

and that loyalty oaths served as a sufficient analogue for §922(g)(5) even in the event Mr. Vazquez-Ramirez's conduct was constitutionally protected.[56]

Following the district court's denial of his motion to dismiss, Mr. Vazquez-Ramirez entered into a conditional plea agreement preserving the right to appeal his Second Amendment challenge.[57] At Mr. Vazquez-Ramirez's sentencing hearing, the district court expressed doubts on the vitality of its own decision, expressing that "I can't pretend to understand *Bruen* or the Supreme Court's statement that they have clarified law" and that "I should modestly claim that I don't have enough intelligence to understand how *Bruen* makes any sense."[58] Mr. Vazquez-Ramirez was eventually sentenced to five years' probation on June 4, 2024.[59] Mr. Vazquez-Ramirez filed his notice of appeal the next day, and this appeal followed.

## VI.  Standard of Review

Mr. Vazquez-Ramirez's constitutional claim is reviewed *de novo. U.S. v. Oliver*, 41 F.4th 1093, 1097 (9th Cir. 2022). Factual findings of the district court regarding a motion to dismiss are reviewed for clear error. S*ee U.S. v. Olsen*, 21 F.4th 1036, 1040 (9th Cir. 2022) (per curiam).

---

[56] *See* 1-ER-26 (Order Denying Motion to Dismiss).
[57] *See generally* 2-ER-32–45 (Plea Agreement).
[58] 3-ER-248 (Sentencing Hearing Transcript 17:2–6)
[59] 1-ER-2 (Judgment).

## VII. Argument

A. **Second Amendment claims center around three main issues.**

Second Amendment claims follow a straightforward inquiry, "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *New York Rifle and Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). The Second Amendment's plain text states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the *people* to keep and bear Arms, shall not be infringed." U.S. Const. amend. II (emphasis added). A "core lawful purpose" of firearms possession is the right to self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008). As a member of the people with Second Amendment rights engaged in the core lawful purpose of firearm possession for self-defense, Mr. Vazquez-Ramirez fulfills this initial step.

After the initial Second Amendment question is satisfied, the burden then shifts to the Government at *Bruen's* second step to justify its regulation by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* A court must consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *U.S. v. Rahimi* 602 U.S.___, 144 S.Ct. 1889, 1898 (2024) (citing *Bruen,* 597 U.S. at 26–31). Courts focus on positive law enactments and must determine whether the

challenged regulation is "relevantly similar" to previously permissible laws. *Bruen*, 597 U.S. at 29.

If laws at the founding dealt with similar problems in a similar way, it will be a "strong indicator" that the restriction is permissible. *Rahimi* 144 S. Ct. at 1898. Conversely, if a general societal problem persisted since the 18th Century, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence" that the regulation is constitutionally impermissible. *Bruen*, 597 U.S. at 26. While this is a historical inquiry, *Bruen* only requires a historical analogue, not a regulatory twin, and reasoning by analogy must be carefully balanced as "analogical reasoning under the Second Amendment is neither a regulatory straitjacket nor a regulatory blank check." *Id.* at 30.

In sum, this Second Amendment inquiry coalesces around three issues:

**1)** Is Mr. Vazquez-Ramirez entitled to Second Amendment protections;

**2)** Is Mr. Vazquez-Ramirez's conduct covered by the Second Amendment;

**3)** Can the Government prove that §922(g)(5) comports with our nation's historical tradition of firearm regulation.

Mr. Vazquez-Ramirez addresses each in turn.

B. **Mr. Vazquez-Ramirez is entitled to Second Amendment protections.**

To establish Second Amendment protection, Mr. Vazquez-Ramirez must be a member of the "people" described in the Second Amendment's plain text. U.S. Const. amend. II. The Ninth Circuit has yet to rule whether undocumented noncitizens such as Mr. Vazquez-Ramirez are entitled to Second Amendment rights and part of "the people". This Circuit, like many sister Circuits,[60] has been able to avoid answering this thorny question by skipping it and instead resolving §922(g)(5) challenges under means-end scrutiny—a now defunct second step in the Second Amendment analysis. *See U.S. v. Torres*, 911 F.3d 1253 (9th Cir. 2019) *(*"assuming without deciding" that undocumented unlawful 'aliens' had Second Amendment rights.); *see also Bruen*, 597 U.S. at 19 ("despite the popularity of this two-step approach, it is one step too many").

Without the escape hatch of means-end scrutiny, and with a lack of sufficient historical analogues to §922(g)(5), this panel must rule on whether individuals like Mr. Vazquez-Ramirez possess Second Amendment rights. While some Circuits

---

[60] *See e.g. U.S. v. Perez*, 6 F.4th 448, 450 (2d Cir. 2021)(assuming without deciding that undocumented alien is entitled to Second Amendment Protection); *U.S. v. Huitron-Guizar,* 678 F.3d 1164, 1169 (10th Cir. 2012)(assuming for the purposes of the case that the Second Amendment could include some aliens); *U.S. v. Jimenez-Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022)("happily" assuming without deciding that undocumented noncitizen is among the people).

have avoided the question to date, other Circuits have taken the plunge with differing outcomes.

> **1. The Fourth, Fifth, and Eighth Circuit's approach veers away from Supreme Court precedent and relies upon dicta.**

The Fourth, Fifth, and Eighth Circuit's pre-*Bruen* position bars noncitizens from being part of "the people". *U.S. v. Carpio-Leon*, 701 F.3d 974, 982 (4th Cir. 2012) ("For the reasons given, we hold that the Second Amendment right to bear arms does not extend to illegal aliens") (emphasis in original); *U.S. v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) ("Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States");[61] *U.S. v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) ("Agreeing with the Fifth Circuit that the protections of the Second Amendment do not extend to aliens illegally present in this country, we affirm.").

Notably, the Fifth (and by extension the Eighth) Circuit held that the use of "the people" in both the Second and the Fourth Amendment does not "mandate a holding that the two amendments cover exactly the same groups of people", because the purposes of the amendments were different. *Portillo-Munoz*, 643 F.3d at

---

[61] The Fifth Circuit's reasoning in *Portillo-Munoz* was recently reaffirmed as consistent with *Bruen*. See *United States v. Medina-Cantu*, 113 F.4th 537 (5th Cir. 2024).

440. Despite this holding being irreconcilable with the rationale of both *Heller* and by extension *Verdugo-Urquidez*, the Fifth Circuit then relies upon *Heller*'s dicta for the proposition that "illegal aliens are not 'law-abiding, responsible citizens' or 'members of the political community'" and therefore not protected by the Second Amendment. *Portillo-Munoz* 643 F.3d at 440, *quoting District of Columbia v. Heller* 554 U.S. 570 (2008). In short, while the Supreme Court never held the Second Amendment applies only to "law-abiding, responsible citizens," the Fifth Circuit concluded that's a reasonable inferential leap to take, with the Fourth and Eighth following suit.

### 2. The Seventh Circuit takes the approach rooted in precedent.

The Seventh Circuit takes a more reasoned approached, finding that certain noncitizens *can* be part of "the people" after establishing substantial connections to the United States, a position rooted in Supreme Court precedent about "the people." *See U.S. v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015) (non-citizens enjoy protections when "they have come within the territory of the United States and developed substantial connections with this country."), *citing U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 270-71 (1990). In doing so, the Seventh Circuit panel reviews *Portillo-Munoz* along with the Fourth and Eighth Circuit decisions, and finds three major problems:

*First*, these decisions ignore longstanding canons for interpreting legal texts. The Seventh Circuit noted the phrase "the people" appears throughout the Bill of Rights, including in the First, Second, and Fourth Amendments. *Id.* at 669. Since these amendments were "adopted as a package," the Seventh Circuit concluded it's sensible to give this phrase the same meaning in accordance with what longstanding interpretative canons require. *See* Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 170 (West 2012) (Contextual Canon #25: "a word or phrase is presumed to bear the same meaning throughout a text").

Unlike the Fourth, Fifth, and Eighth Circuit's reliance upon dicta, the Seventh Circuit buoyed this conclusion with precedent, noting the Supreme Court itself describes this phrase (the people) as "a term of art employed in select parts of the Constitution." *Meza-Rodriguez*, 798 F.3d at 670 (citation omitted); *see also Range v. A.G.*, 69 F.4th 96, 101-02 (3d Cir. 2023) (en banc) ("Unless the meaning of the phrase 'the people' varies from provision to provision—and the Supreme Court in Heller suggested it does not," "we see no reason to adopt an inconsistent reading of 'the people'" within the Bill of Rights). Following this longstanding interpretative canon, the Seventh Circuit concluded it makes little sense to find the phrase "the people" includes noncitizens when it comes to First and Fourth Amendment protections, but not Second Amendment protections.

– 23 –

*Second*, as previously noted, these decisions rely upon dicta from *Heller* regarding "law abiding" and the "political community", words the Seventh Circuit was "reluctant" to place "weight on," as "the question in *Heller*" involved whether the Second Amendment protected "an individual or collective right," and "aliens were not part of the calculus" in resolving that question. *Meza-Rodriguez*, 798 F.3d at 669; *see also Perez-Garcia*, 96 F.4th 1166, 1179 (9th Cir. 2024) (declining to decide Second Amendment challenge to pretrial release disarmament on theory that non "law-abiding citizens" categorically fall outside the Second Amendment).

*Third*, these decisions gloss over several Supreme Court cases finding that "aliens enjoy certain constitutional rights" when "they have come within the territory of the United States and developed substantial connections with this country." *Verdugo-Urquidez*, 494 U.S. at 270-71. The Seventh Circuit held this test, referred to as the "substantial connections test," should serve as the benchmark for determining whether non-citizens also enjoy Second Amendment protections.

As it has come time to pick a side, Mr. Vazquez-Ramirez urges this Circuit to pick the side rooted in the Supreme Court's precedent and interpretative canons regarding the "people", rather than dicta from the same line of cases. This Circuit should join the Seventh Circuit in applying the "substantial connections test" to Second Amendment protections in accordance with *Verdugo-Urquidez*.

### 3. Mr. Vazquez-Ramirez fulfills the substantial connection test.

Applying the substantial connections test, Mr. Vazquez-Ramirez receives Second Amendment protections. *See Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 996-97 (9th Cir. 2012) (applying test from *Verdugo-Urquidez* and finding a non-citizen pursuing Ph.D. in the United States for four years had established significant voluntary connection with the United States such that she could invoke Bill-of-Rights protections); *U.S. v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) (applying test from *Verdugo-Urquidez* and finding status less person could invoke Bill-of-Rights-protections because he came to this country as a child, attended public schools here, developed close relationships in the community here, and worked sporadically here).

Mr. Vazquez-Ramirez was brought to the United States as a child and he never left, meaning he's been continuously in our country for over three decades.[62] He attended elementary school through high school in the State of Washington.[63] At school he learned to speak English, pledged allegiance to the flag, and learned our nation's history.[64] He has two children who are citizens who he works hard to support both as a farmhand and a diesel mechanic.[65] His children also attend school

---

[62] 2-ER-227 (Declaration of Oscar Vazquez-Ramirez).
[63] *Id.*
[64] *Id.*
[65] *Id.*

in the State of Washington, and he attends church every week in Othello with his family.[66]

Because Mr. Vazquez-Ramirez's connections to this country run deep, he meets his burden to show the Second Amendment protects his conduct of purchasing a pistol for lawful self-defense of him and his family—an act the Tenth Circuit posited as wholly reasonable, even for noncitizens. See *Huitron-Guizar*, 678 F.3d at 1170 ("If the right's 'central component,' as interpreted by Heller, is to secure an individual's ability to defend his home, business, or family, which often includes children who are American citizens, why exactly should all aliens who are not lawfully resident be left to the mercies of burglars and assailants?") (cleaned up).

C. **Mr. Vazquez-Ramirez's conduct falls under the plain text of the Second Amendment.**

After establishing that Mr. Vazquez-Ramirez is a member of the people, *Bruen*'s first step requires courts to look at whether the Second Amendment's plain text is "tied to the conduct the regulation prevents the individual from engaging in." *U.S. v. Manney*, ___F.4th___, 2024 WL 3853846 at *4 (9th Cir. 2024), *quoting Doe v. Bonta*, 101 F.4th 633, 639 (9th Cir. 2024) (quotations omitted). In Mr.

---

[66] *Id.*

Vazquez-Ramirez's case, §922(g)(5) categorically prevents *any* possession of firearms. This restriction categorically forbids Mr. Vazquez-Ramirez's proposed plan of protecting his family from a crime-ridden neighborhood in Othello with a handgun. As "the individual right to armed self-defense," is protected by the Second Amendment, the Second Amendment's plain text is directly tied to §922(g)(5)'s blanket ban on possession. *Bruen*, 142 S. Ct. at 2128. Accordingly, Mr. Vazquez-Ramirez's proposed conduct falls under the plain text of the Second Amendment.

The district court and the Government fall astray in arguing that because Mr. Vazquez-Ramirez was potentially carrying his firearm in a concealed fashion without a permit, that it changes the conduct inquiry under *Bruen*.[67] Not so. Here, the conduct being regulated isn't Mr. Vazquez-Ramirez possessing a pistol without a permit; it's him possessing a pistol for protection as a *status-less* person. If the government charged Mr. Vazquez-Ramirez with violating Washington's concealed-carry law, and Mr. Vazquez-Ramirez brought a *Bruen* challenge to that statute, then the government's points would be well-taken. But he's not. And he was never charged under a concealed-carry statute.

---

[67] 1-ER-20 (Order Denying Motion to Dismiss)("Defendant's conduct in violation of the lawful state prohibition is not protected by the Second Amendment").

*Bruen*'s inquiry focuses on the firearm regulation *at issue*, not other subsidiary violations of a different statute. *See U.S. v. Sitladeen*, 64 F.4th 978, 985 (8th Cir. 2023) (noting a *Bruen* analysis begins "by asking whether *the firearm regulation at issue* governs conduct that falls within the plain text of the Second Amendment") (emphasis added). As a member of "the people", Mr. Vazquez-Ramirez's proposed conduct of firearm possession for lawful self-defense properly falls under the plain text of the Second Amendment. With the first step of *Bruen* established, the burden shifts to the Government to find adequate historical justification for a limitation of Mr. Vazquez-Ramirez's Second Amendment rights.

### D. The Government cannot establish that §922(g)(5) comports with the Founders' historical understanding of firearm regulation.

Once Mr. Vazquez-Ramirez establishes that he is a member of the people engaged in constitutionally protected conduct, the burden shifts to the Government to provide relevant historical analogues. While it is ultimately the Government's burden to provide historical evidence, one historical analogue has become a flashpoint of contention in the *Bruen* sphere and played a pivotal part in the lower court's decision: loyalty oaths.[68] For ease of briefing, Mr. Vazquez-Ramirez addresses these oaths preemptively.

---

[68] 1-ER-26 (Order Denying Motion to Dismiss).

**1. Some states during the Revolutionary War instituted temporary loyalty-based disarmaments.**

Loyalty oath disarmaments were colonial government ordinances passed during the Revolutionary War that premised firearm possession on an oath of loyalty to the emerging republic of America.[69]  In essence, loyalty oaths secured the safety of Founders era freedom fighters from British 'turncoats' in a time of war.[70] These regulations were passed during "the darkest days of an existential domestic war" between a newly formed republic and Great Britain.[71] Four specific regulations were highlighted in Professor Gulasekaram's declaration and addressed by the Government.[72] They are as follows:

| Loyalty Oaths at the Founding | | |
|---|---|---|
| Date | State of Origin | Who it Disarms |
| 1776 | Massachusetts | "who refuse to defend by arms the…Colonies" |
| 1776 | Pennsylvania | "Non-associators" |
| 1777 | Virginia | Who refuse to take an "oath or affirmation" of allegiance. |
| 1779 | Pennsylvania | Who have not given attestations of allegiance to the State. |

---

[69] *See* 3-ER-284–5 (Evidentiary Hearing Transcript 33:22–34:4).
[70] *See* Amanda L. Tyler, *Rahimi, Second Amendment Originalism, and the Disarming of Loyalists During the American Revolution*, Lawfare, Nov. 30, 2023 ("There is no question that loyalists who supported the British in the Revolutionary War posed an enormous threat to the national security of the new state, and that is why many states responded aggressively to that threat.")
[71] C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 725 (2009).
[72] 2-ER-200–202 (Declaration of Gulasekaram).

– 29 –

Despite their status as wartime measures, loyalty oaths have been stretched far beyond recognition by proponents of the constitutionality of §922(g)(5) to stand for the wholesale disarmament of categorical immigration classes.[73] In evaluating historical analogues, *Bruen* and *Rahimi* stress the importance of the "how" and "why" of a proposed analogue regulation burdening the Second Amendment is pivotal. *Bruen*, 142 S. Ct. at 2133 (noting reasoning-by-analogy requires courts to examine "how and why" the Founding-era "regulations burden[ed]" the right to armed self-defense); *Rahimi* 144 S. Ct. at 1898 ("Why and how the regulation burdens the right are central to this inquiry"). As loyalty oaths were temporary wartime disarmaments, they fail to cohere with the "how" and "why" of §922(g)(5).

### a.    The "how" of loyalty oaths differ from §922(g)(5).

Loyalty oaths were temporary disarmaments, premised on the administration of an oath, or the lack of an oath. Non-associators could normally regain their arms upon demonstrating they weren't disaffected to the American cause or demonstrating a satisfactory reason for recusal.[74]

---

[73] *See* 2-ER-108 (Government's Response).
[74] *See United States v. Duarte*, 101 F.4th 657, 683 (9th Cir.), reh′g en banc granted, opinion vacated, 108 F.4th 786 (9th Cir. 2024).

§922(g)(5) by contrast is a permanent ban on possession of a firearm for an undocumented noncitizen with no redress while living in the U.S. outside of becoming a legal permanent resident or citizen. Immigration law is a byzantine labyrinth of statutes, regulations, and court precedent.[75] Lawful admission hinges upon the ability of individuals to navigate eligibility within statutory criteria, and many individuals can be categorically barred from obtaining admissibility into the United States for reasons entirely outside their own volition.[76]

If immigrating to the United States was as simple as swearing an oath or demonstrating a satisfactory reason, our immigration system would be unrecognizable. Instead, we have clogged immigration courts,[77] thousands of appeals filed to this Circuit every year disputing immigration issues,[78] and millions of asylum seekers expelled from our borders.[79] The complexity of this system is well

---

[75] *Al Bajah v. Holder*, 311 F. App'x 995, 997 (9th Cir. 2009)( Pregerson, J., dissenting)("our Byzantine immigration laws and administrative regulations are second or third in complexity to the Internal Revenue Code.")

[76] *See e.g. Public Charge Ground of Inadmissibility*, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, https://www.uscis.gov/policy-manual/volume-8-part-g (outlining inadmissibility for those "likely at any time to become primarily dependent on the government for subsistence").

[77] *U.S. Immigration Courts See a Significant and Growing Backlog*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE (Oct. 19, 2023) https://www.gao.gov/blog/u.s.-immigration-courts-see-significant-and-growing-backlog (last accessed September 27, 2024).

[78] *Ninth Circuit 2023 Annual Report*, at 59 (2023).

[79] Muzzaffar Chishti, Kathleen Bush-Joseph, & Julian Montalvo *Title 42 Postmortem: U.S. Pandemic-Era Expulsions Policy Did Not Shut Down the Border,* MIGRANT POLICY INSTITUTE (April 25, 2024) https://www.migrationpolicy.org/article/title-42-autopsy .

beyond the scope of this case, but the fact that this complexity exists distinguishes §922(g)(5) from loyalty oaths.

Additionally, in contrast to loyalty oaths, §922(g)(5) is wholly disconnected from any affirmative dangerousness finding or specific national security concern. While loyalty oaths were temporary local ordinances, tuned to the needs of a wartime nation, §922(g)(5) is a broad categorical ban without exception. After falling under its ambit, Mr. Vazquez-Ramirez had no opportunity to regain his firearms through simply swearing an oath, nor demonstrating a satisfactory reason for recusal.

For Mr. Vazquez-Ramirez, regaining gun rights under §922(g)(5) isn't as simple as swearing an oath of loyalty. Were that the test, he would have demonstrated eligibility hundreds of times over by swearing allegiance to the flag every morning at school.[80] Loyalty isn't the cornerstone of the U.S. immigration system and, can't serve as the analogous cornerstone of §922(g)(5) either.

### b.    The "why" of loyalty oaths differ from §922(g)(5).

The Government's cited loyalty oaths were passed between 1776–1779 during a time of war in the colonies. Between 1775–1783, the nascent United States was a

---

[80] *See* 2-ER-87 (Second Declaration of Oscar Vazquez-Ramirez).

battlefield.[81] Thirteen young colonies witnessed armies being assembled and battles waged.[82] Loyalty oaths were not enacted as a simple test, they were enacted for urgent national security needs.[83] In 1776, Pennsylvania passed a loyalty-oath ordinance. That same year, in Pennsylvania on Christmas Day, George Washington staged his troops in the colony before crossing the Delaware to raid Hessian mercenaries at the Battle of Trenton in a surprise attack.[84] Regulations made sense because "[T]here [wa]s great reason to believe" that "dangerous and disaffected" persons "communicate[d] intelligence to the [British] enemy." Act of 1778, 1 Laws of the State of New York Passed at the Sessions of the Legislature 50 (1777-1784).

In contrast, the United States was not at war within its own borders in 1968 when the precursor to §922(g)(5) was codified, nor currently at war with Mexico to justify Mr. Vazquez-Ramirez's disarmament.[85] In the event that the U.S. was to be

---

[81] *See generally American Revolution*, ENCYCLOPEDIA BRITANNICA (Sept. 16, 2024) https://www.britannica.com/event/American-Revolution (last accessed September 27, 2024).
[82] *Id.*
[83] *See* Amanda L. Tyler, *Rahimi, Second Amendment Originalism, and the Disarming of Loyalists During the American Revolution*, Lawfare, Nov. 30, 2023
[84] *See generally American Revolution*, ENCYCLOPEDIA BRITANNICA (Sept. 16, 2024) https://www.britannica.com/event/American-Revolution (last accessed September 27, 2024).
[85] *See* Pratheepan Gulasekaram, *Loyalty Disarmament & the Undocumented,* COLUM. L. REV. F. at 9 (forthcoming).

involved in military conflict with Mexico, presumably a litany of national security laws would trigger to satisfy the same security concerns of loyalty oaths.[86]

§922(g)(5) is not a national security law, instead this Circuit has held that it was established to fulfill "the government's interests in controlling crime and ensuring public safety by keeping firearms out of the hands of unlawful aliens." *U.S. v. Torres* 911 F.3d 1253, 1264 (9th Cir. 2019). While both laws were concerned about safety in a highly general sense, "courts should not uphold every modern law that remotely resembles a historical analogue because doing so risks endorsing outliers that our ancestors would never have accepted." *Bruen* 597 U.S. at 30, *quoting Drummond v. Robinson*, 9 F. 4th 217, 226 (3rd Cir. 2021) (quotation marks omitted). General concerns about safety cannot be the foundation of a representative analogue, especially considering the inherently unsafe nature of firearms.

Notably as well, loyalty oaths were not a green light on disarming those outside of the political community, but rather an intra-political community distinction. "[A]s the Revolutionary War unfolded, the dominant understanding viewed those disaffected to the American cause as squarely within the political community of rights-bearing members."[87] Therefore, it is neither permissible to

---

[86] *Id.*, *citing* 18 U.S.C. §§ 922(d)(10), (i), (l), and 18 U.S.C. §§ 2332, 2339A, 2339B & 2339D (EP).

[87] Amanda L. Tyler, *Rahimi, Second Amendment Originalism, and the Disarming of Loyalists During the American Revolution*, Lawfare, Nov. 30, 2023

portray loyalty oaths as an explicitly assigning firearms to the political community at the expense of the exiled. Keeping firearms out of the hands of your direct enemies made sense in a time of war, it does not establish a historical tradition of disarming undocumented noncitizens.

### 2. The Government must establish that §922(g)(5) actually addresses the "principle" it purports to address.

Even assuming that loyalty oaths establish a historical tradition of disarming individuals deemed dangerous by the sovereign sufficient to analogize to §922(g)(5) (which they don't), §922(g)(5) casts too wide a net to be "relevantly similar" to this principle of regulation.

The immigration term "alien" covers a panoply of individuals ranging from a pregnant 18-year-old asylum seeker fleeing violence in their home country to an individual previously deported for committing violent aggravated felonies. "The class of aliens is itself a heterogeneous multitude of persons with a wide-ranging variety of ties to this country." *Mathews v. Diaz*, 426 U.S. 67, 78-79 (1976). This heterogeneity is greeted by §922(g)(5)'s homogeneity—a categorical ban on any "alien" possessing a firearm. This homogeneity stems from a legislative belief that

individuals in the immigration category of "alien" possesses a heightened risk of

danger.[88] However, this belief is only that, a belief.

It is not a belief supported by data. In fact, it is a belief contradicted by data.[89]

The Second Amendment does not perish in the face of ill-informed legislative

beliefs, it only yields to our nation's historical tradition of firearms regulation. *See*

*Worth v. Jacobson*, 108 F.4th 677, 694 (8th Cir. 2024) (holding that even with

statistical data of elevated level of violence for 18–20-year-olds, lack of "credible

threat" prohibited regulation of their public carry rights). Beliefs alone cannot form

the basis of a constitutional restriction because "a legislature's ability to deem a

category of people dangerous based only on belief would subjugate the right to bear

arms 'in public for self-defense' to 'a second-class right, subject to an entirely

different body of rules than the other Bill of Rights guarantees.'" *Id.* (quoting *Bruen*,

597 U.S. at 70).

Because of legislative beliefs, Mr. Vazquez-Ramirez was restricted from

firearm possession without an individualized danger determination or any

determination that he was a "credible threat" of violence beyond never updating his

---

[88] *Torres,* 911 F.3d at 1264.
[89] *Undocumented Immigrant Offending Rate Lower than U.S.-Born Citizen Rate*, NAT'L INST. JUST. (Sept. 12, 2024) https://nij.ojp.gov/topics/articles/undocumented-immigrant-offending-rate-lower-us-born-citizen-rate (last accessed September 27, 2024) (finding that undocumented immigrants are arrested at less than half the rate of native-born U.S. citizens for violent and drug crimes and a quarter the rate of native-born citizens for property crimes).

immigration paperwork. *See Rahimi* 144 S. Ct. at 1902 ("An individual *found by a court* to pose a credible threat to the physical safety of another may be *temporarily* disarmed consistent with the Second Amendment") (emphasis added). Even if the legislators in 1968 believed that the principle of their belief cohered with founding era historical regulation of firearms, an unsupported belief alone cannot overcome Mr. Vazquez-Ramirez's Second Amendment rights.

As loyalty oaths cannot serve as a valid historical analogue, and no other analogue provides any legitimate relevance, the nation's historical tradition of firearm regulation does not support the constitutionality of §922(g)(5)

E. **The district court erred in adopting rational basis review.**

In first evaluating Mr. Vazquez-Ramirez's motion under rational basis review, the district court accepted the Government's argument that because §922(g)(5) relates to immigration, it takes it out of the normal orbit of *Bruen*'s test.[90] In applying such a standard, the district court forged wholly new ground in contradiction of established Supreme Court precedent regarding both immigration, the Second Amendment, and every other enumerated right in the Constitution..

*First,* just because the Government utters the word immigration in a criminal prosecution, the constitution doesn't fall to the wayside. This commonsense

---

[90] 1-ER-16 (Order Denying Motion to Dismiss).

sensibility dates back over 150 years to when the Supreme Court clarified that the Fourteenth Amendment extended beyond citizens. *See Yick Wo v. Hopkins* 118 U.S. 356 (1886); *see also Wong Wing v. U.S.*, 163 U.S. 228 (1896) (extending protections from select amendments in the Bill of Rights to "all persons within the territory of the United States," including "aliens".)

     ***Second***, the district court's reliance on *Matthews v. Diaz* is misplaced.[91] *Matthews* while considering a due process challenge to Medicare enrollment rightfully says that "Congress regularly makes rules that would be unacceptable if applied to citizens," it then immediately clarifies what it's referring to citing "the exclusion of aliens" and "the power to deport" as two areas that would be unacceptable if applied to a citizen. *Matthews*, 426 U.S. at 80. As *Matthews* was a due process challenge to Medicare enrollment for noncitizens, distinctions between the privileges of citizens and noncitizens makes sense. What *Matthews* never holds is that Congress can make rules according *criminal liability* unacceptable to noncitizens.

     ***Third***, the potential fallout of such a finding would be catastrophic for noncitizen constitutional legislation as a whole. If the U.S. Government was afforded plenary power over a core individual rights such as the Second

---

[91] 1-ER-14 (Order Denying Motion to Dismiss).

Amendment, presumably this power could be extended to every other individual assurance in the Bill of Rights.[92] Positive legislation with a rational basis could then remove noncitizens right to be free from unreasonable search and seizures under the Fourth Amendment, despite being purportedly protected under *Verdugo-Urqiduez* for over 30 years. Under the First Amendment, noncitizens could be legislatively silenced as long as there was a rational basis, despite non-citizens having establish First Amendment Rights for over 75 years.[93]  Perhaps most shockingly, in a country founded in part by immigrants fleeing religious persecution, noncitizens' religious beliefs could be legislated away.

　　　To hold that the Government is allowed to wholesale infringe upon individual constitutional rights in a criminal prosecution simply because it involves immigration categories would be a shocking decision in defiance of established Supreme Court precedent  and usher in a new potential era of legislating away the existing individual rights of noncitizens. Rational basis cannot be the standard under which Mr. Vazquez-Ramirez's claim is adjudicated.

---

[92] Pratheepan Gulasakeram, *Immigration Exceptionalism*, 77 VAND. L. REV. EN BANC 1 (2024)("The [*Vazquez-Ramirez*] opinion's exceptional deference would permit Congress to run roughshod over constitutional safeguards in all regulatory fields, both civil and criminal, involving any category of noncitizens.")
[93] *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (holding that a non-citizen who published communist literature was protected by First Amendment); *see also Kwong Hai Chew v. Colding*, 344 U.S. 590, 597 n.5 (1953) (noting that neither the First nor Fifth Amendment distinguishes between citizens and "legal resident aliens").

F. **Mr. Vazquez-Ramirez notes a miscite underlies 9ᵗʰ Circuit precedent.**

In response to Mr. Vazquez-Ramirez's briefing at the lower court, the Government attempted to argue that constitutional protections only ever applied when "an alien has assumed the complete range of obligations that we impose on the citizenry." *U.S. v. Barona*, 56 F.3d 1087, 1093–94 (9th Cir. 1995). This bold statement stood out to the defense as out of line with existing precedent, prompting further inquiry. What the defense discovered was a critical miscite spanning at least two Ninth Circuit cases that should be corrected.

*Barona* was purportedly quoting the Supreme Court in *Verdugo-Urquidez*, except the Supreme Court never actually says the purported quote in its decision. *See generally* 494 U.S. 259 (1990). So where does the quote come from? Judge Wallace's dissent in the **circuit court.** *U.S. v. Verdugo-Urquidez*, 856 F.2d 1214, 1236 (9th Cir. 1988) (Wallace, J., dissenting). As a result, both *Barona* and cases quoting it are improperly relying upon a Circuit level dissent wolf in Supreme Court clothing to make an incredibly broad and impactful claim. *See U.S. v. Zakharov*, 468 F.3d 1171,1179–80 (9th Cir. 2006)*; (quoting United States v. Barona*, 56 F.3d 1087, 1093–94 (9th Cir. 1995)).

Judge Wallace's circuit-level dissent doesn't set the test for determining constitutional protections; the Supreme Court's decision in *Verdugo-Urquidez* does.

Mr. Vazquez-Ramirez urges the panel to both disregard this precedent and recognize that to the extent this statement from *Barona* relies upon a miscite it should be excised from 9th Circuit precedent as overturned by the Supreme Court.

## VIII.    Conclusion

For the reasons above, Mr. Vazquez-Ramirez respectfully asks this Court to reverse the district court's ruling.

Dated: September 27, 2024.

Federal Defenders of Eastern Washington & Idaho
Attorneys for Oscar Vazquez-Ramirez

s/Carter Powers Beggs
Carter Powers Beggs, WSBA No. 60065
601 West Riverside Ave., Suite 900
Spokane, Washington 99201
t: (509) 624-7606
f: (509) 747-3539
Carter_powersbeggs@fd.org

## Service Certificate

I certify that, on September 27, 2024, I caused to be electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit, and all parties will receive electronic service.

s/Carter Powers Beggs
Carter Powers Beggs, WSBA No. 60065
601 West Riverside Ave., Suite 900

Spokane, Washington 99201
t: (509) 624-7606
f: (509) 747-3539
Carter_powersbeggs@fd.org

# United States Court of Appeals
## For the Ninth Circuit

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

**9th Cir. Case Number(s)**:24-3544

The undersigned attorney or self-represented party states the following:

[ x ] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*/s/ Carter Powers Beggs*                    Date: September 27, 2024
Carter Powers Beggs

# United States Court of Appeals
## For the Ninth Circuit

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s): 24-3544**

I am the attorney or self-represented party.

**This brief contains 7346 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** s/ Carter Powers Beggs     **Date: September 27, 2024**
Carter Powers Beggs

– 44 –